# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### March 4, 2014 Session

## STATE OF TENNESSEE v. JERRY SHERRILL, II

**Appeal from the Circuit Court for Obion County**
**No. CC-12-CR-141     William B. Acree, Jr., Judge**

---

**No. W2013-01166-CCA-R3-CD  - Filed May 30, 2014**

---

An Obion County jury found the Defendant, Jerry Sherrill, II, guilty of theft of property valued between $1,000 and $10,000. The trial court sentenced the Defendant to eight years as a Range II, persistent offender. The Defendant appeals, asserting that: (1) the trial court improperly ruled that his prior theft convictions could be used for impeachment purposes should he testify at trial; (2) the evidence is insufficient to sustain his conviction; (3) the trial court improperly required the jury to continue deliberations; and (4) the trial court improperly instructed the jury concerning possession of recently stolen property. After a thorough review of the record and the applicable law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

James T. Powell, Union City, Tennessee, for the appellant, Jerry Sherrill, II.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Thomas A. Thomas, District Attorney General; and James T. Cannon, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

A 1979 white Chevrolet Camaro was stolen by an unknown person on October 21, 2011, from Heritage Auto in Mayfield, Kentucky. On May 16, 2012, the Defendant, driving the stolen Camaro, was stopped in Union City, Tennessee. An Obion County grand jury

indicted the Defendant for theft of property valued between $1,000 and $10,000 and two counts of fraudulently altering or changing an engine or serial number.

At a trial on these charges, the parties presented the following evidence: Joey Faulkner, a Union City Police officer, testified that, on May 16, 2012, he observed the Defendant driving "an older model white Camaro." Officer Faulkner said that he knew that the Defendant's license was suspended, so he initiated a traffic stop.

Officer Faulkner testified that he approached the vehicle and asked the Defendant for his driver's license. The Defendant told the officer that he did not have a driver's license. Officer Faulkner "ran a license check" confirming that the Defendant's license had been suspended for failure to satisfy a citation. Officer Faulkner said that the Defendant also could not produce a registration to prove ownership of the vehicle or proof of car insurance. The Defendant explained to Officer Faulkner that he had bought the car from "somebody" in Nashville two and a half years before. He said that he was unable to obtain the necessary paperwork from the seller in order to register the vehicle.

Tack Simmons, a Union City Police Department officer, testified that he served as a back-up officer during Officer Faulkner's traffic stop of the Defendant. Officer Simmons said that, when he arrived, Officer Faulkner was checking the Defendant's driving status. Officer Simmons walked to the vehicle to find the VIN number from the driver's side dashboard. Officer Simmons said that the VIN number plate was "hanging and you couldn't really read the numbers that well." Officer Simmons attempted to "scratch the paint," so he could better see the numbers. In so doing, "the plate fell through the dash down into the dashboard." The Defendant told Officer Simmons that he had put a new "dash" in the car and, in the process, removed the VIN plate from the old dashboard and placed it on the new dashboard. To recover the plate for Officer Simmons, the Defendant disassembled the dashboard and "reached inside and got it." Officer Simmons noted that this was the first time he had ever had contact with a VIN plate and that came off a vehicle.

Officer Simmons testified that, after the Defendant recovered the VIN plate, he attempted to run the VIN number to find information about the car. Officer Simmons said that he did not recall the information gained from the VIN number search.

Danny Wilson, a Tennessee Highway Patrol ("THP") Criminal Investigation Division Sergeant, testified that his division investigates cases involving auto theft, odometer fraud, and ID theft for the State of Tennessee. Sergeant Wilson recalled that Officer Faulkner contacted him concerning a 1979 Camaro with a VIN plate that had come loose from the dashboard. On May 22, 2010, Sergeant Wilson went to Union City to examine the Camaro. Sergeant Wilson described the Camaro as "fairly well-maintained" and noted that the vehicle

2

had been "restructured." He said that the shift handle on the transmission was gone and that the console had been taped up and painted. He said that, inside the car, he found a brand new ignition recently purchased from a local store. Sergeant Wilson described the steering column in the car as having been "busted." He opined that the column was broken to start the vehicle without keys. He said a broken steering column was a "telltale sign" that a vehicle was stolen.

Sergeant Wilson identified photographs of the damaged steering column in the 1979 Camaro. He also identified a photograph of the missing ignition. He explained that to unlock the steering wheel, the ignition must be removed. The photograph displayed an empty hole where the ignition had been.

Sergeant Wilson testified that GMC typically attached VIN plates to vehicle dashboards with rosette rivets. The VIN plate found in the 1979 Camaro was not attached with rivets but with an adhesive. Sergeant Wilson used the VIN number on the Camaro's VIN plate to try and learn more information about the vehicle, but there was no information on file for the VIN number. Sergeant Wilson said that there are "secondary release or confidential VIN number[s]" on most vehicles. Sergeant Wilson located the secondary release number on the Camaro, and the number did not match the number on the VIN plate. Through other means of investigation, however, Sergeant Wilson was ultimately able to confirm that the vehicle had been reported stolen in Kentucky in 2011.

Sergeant Wilson testified that he contacted Mark Gardner, the owner of Heritage Motor, to gather more information and to verify the Camaro was stolen from Heritage Motor. Sergeant Wilson learned that the keys were not taken when the car was stolen and that Heritage Motor still had the keys for the Camaro. Sergeant Wilson tested the keys on the vehicle and found that the keys opened the passenger door of the vehicle.

Sergeant Wilson testified that the 1979 Camaro had an expired dealer tag on the back of the vehicle. The tag had expired in 2010, but Sergeant Wilson was still able to trace the dealer plate to a car lot in Union City owned by "Mr. Sherrill, Sr. and his wife." Sergeant Wilson obtained search warrants for Mr. Sherrill, Sr.'s, residence and the Defendant's residence. Sergeant Wilson also obtained a consent to search the business. During the search, police officers found two VIN plates in a desk drawer. Sergeant Wilson said that he found the loose VIN plates "unusual" because the law prohibits the removal of a VIN plate from any vehicle. Sergeant Wilson said that during the search of the Defendant's house a receipt book was recovered.

On cross-examination, Sergeant Wilson said that the car lot was owned by Jerry Sherrill, Sr., and the Defendant worked there. Sergeant Wilson read a receipt dated

December 15, 2011, from the receipt book found in the Defendant's home as follows:

> I, Bennie Smith, sold to [the Defendant] - - sold [the Defendant] a '79 Z28 for
> $1,000 and am owed another $1,000 when I bring back the title.

Sergeant Wilson said that he located Bennie Smith in the Wilson County Complex and spoke with him about the Camaro and the receipt. Bennie Smith denied selling the vehicle to the Defendant.

Tad Anderson testified that he was the general manager at Heritage Auto LLC, in Mayfield, Kentucky, and in his role as manager, he saw every vehicle that was bought and sold there. Mr. Anderson recalled that the 1979 Chevrolet Camaro came to the dealership as a trade-in from Mike Smith of Paducah, Kentucky. The car was at Heritage Auto for "roughly a couple of weeks" before it was stolen on October 21, 2011. Mr. Anderson said that he came in for work on that day and found only broken glass where the Camaro had been parked. He said that the owner of Heritage Auto, Mark Gardner, purchased the Camaro for $6,100, but the Camaro's listed price was $10,000. Mr. Anderson described the Camaro as having been in "perfect" condition. Mr. Anderson said that "in normal circumstance[s]" the title for a car shows dealer assignment from one party to the next party. He did not recall whether the previous owner and Heritage Auto were listed in that manner on the title for the Camaro, explaining that the title for the Camaro was turned into the insurance company for reimbursement at the time the car was stolen. Mr. Anderson identified the stolen Camaro in photographs taken by the police as the same Camaro the Defendant was driving on May 16, 2012.

The State announced the completion of its proof in this case, and the defense offered the following evidence: Jessica Caudle, the Defendant's fiancé, testified that the Defendant purchased the white Camaro on December 15, 2011, from Bennie Smith. She said that Mr. Smith came to their home at 10:30 p.m. or 11:00 p.m. and said he had a car "he needed to get rid of." Mr. Smith drove a pick-up truck to their house with a trailer carrying the car he wanted to sell. Ms. Caudle described the car as white, and she said that it did not have a motor or transmission in it. She said that she had the opportunity to examine the car, and the dashboard was not broken nor was the steering column. She recalled that Mr. Smith wanted $2,000 for the car, but she and the Defendant offered only $1,000 with another $1,000 once Mr. Smith brought the title to them. Ms. Caudle identified the receipt of the transaction and confirmed that she witnessed Mr. Smith sign the receipt. She said they paid Mr. Smith the initial $1,000, but he never returned with the title to the car. She said that the Defendant planned on putting a motor and transmission in the car and giving it to Ms. Caudle's son when he turned sixteen.

Ms. Caudle testified about the broken steering wheel column in the Camaro at the time of the Defendant's arrest. She said that she and the Defendant had gone to Jackson for dinner. The two had "several drinks" at dinner and "somehow" lost the keys to the car. In the parking lot next to them was a man in a "work truck." She and the Defendant borrowed tools from him, and the Defendant broke the steering column in order to drive home in the Camaro without the car keys.

Bennie Smith testified that he was incarcerated in Nashville. He denied selling the Defendant the 1979 Camaro on December 15, 2011. Mr. Smith looked at the receipt and denied that it was his signature on it. Mr. Smith said that in December 2011, he drove a Ford Explorer and that he did not own a pickup truck or a trailer.

Sherry Dunn, Deputy Clerk for the Obion County Clerk's office, testified that in late October or early November 2012, the Defendant contacted her concerning obtaining title for a 1979 Camaro. Ms. Dunn looked up the last registered owner with the VIN number the Defendant provided and found that the last registered owner was Betty Bentley from Nashville. Ms. Dunn said that the Defendant contacted her about the title more than once and seemed "concerned because he couldn't get a title to it."

The State re-called Sergeant Wilson in rebuttal. Sergeant Wilson testified that he obtained a warrant for the Defendant's arrest on May 23, 2012. He was unable to find the Defendant at his residence and so he spoke with the Defendant's mother, who stated that the Defendant would turn himself in. A few days later, the Defendant did in fact turn himself in to authorities.

After hearing the evidence, the jury convicted the Defendant of theft of property valued between $1,000 and $10,000 and acquitted the Defendant as to the other charges. At a subsequent sentencing hearing, the trial court sentenced the Defendant to serve eight years as a Range II, persistent offender. It is from this judgment the Defendant now appeals.

## II. Analysis

The Defendant appeals asserting that: (1) the trial court improperly ruled that his prior theft convictions could be used for impeachment purposes should he testify at trial; (2) the evidence is insufficient to sustain his conviction; (3) the trial court improperly required the jury to continue deliberations; and (4) the trial court improperly instructed the jury concerning possession of recently stolen property. The State asks this Court to affirm the judgment in all respects.

### A. Admission of the Defendant's Prior Theft Convictions

The Defendant asserts that the trial court erred when it determined that his prior convictions for theft could be used for impeachment purposes should he choose to testify. The State responds that, because the Defendant's credibility concerning how he came into possession of the vehicle was at issue, the trial court correctly determined that the Defendant could be questioned about his prior theft convictions. We agree with the State.

Rule 609 of the Tennessee Rules of Evidence permits the State to attack the credibility of a criminal defendant by presenting evidence of prior convictions if four conditions are satisfied. *See* Tenn. R. Evid. 609. First, the prior conviction must be punishable by death or imprisonment over one year or must involve a crime of dishonesty or false statement. *See* Tenn. R. Evid. 609(a)(2). In addition, less than ten years must have elapsed between the defendant's release from confinement for the prior conviction and the commencement of the subject prosecution. *See* Tenn. R. Evid. 609(b). Finally, the State must give reasonable pre-trial written notice of the impeaching conviction, and the trial court must find that the impeaching conviction's probative value on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues. *See* Tenn. R. Evid. 609(a)(3).

It is the last of these conditions that is at issue in this case. The Defendant complains that three of the four impeaching convictions were for theft, the exact crime for which the Defendant was being tried. The trial court's ruling, according to the Defendant, essentially prohibited him from testifying on his own behalf because the jury "would have more likely than not convicted the [Defendant]" based on the prior convictions.

This Court reviews the trial court's ruling on the admissibility of prior convictions for impeachment purposes under an abuse of discretion standard. *See State v. Mixon*, 983 S.W.2d 661, 675 (Tenn. 1999); *State v. Blanton*, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996). A trial court abuses its discretion only when it "'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)).

Trial courts should engage in a two-prong analysis when determining if the probative value of the impeaching conviction is outweighed by its prejudicial effect. *Id*. Trial courts are required to expressly (1) "analyze the relevance the impeaching conviction has to the issue of credibility," as well as (2) "assess the similarity between the crime on trial and the crime underlying the impeaching conviction." *Id*. (citations omitted). The mere fact that a prior conviction of the accused is identical or similar in nature to the offense for which the accused is being tried does not, as a matter of law, bar the use of the conviction to impeach the accused as a witness. *State v. Baker*, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997)

6

(citations omitted). However, "[w]hen an impeaching conviction is substantially similar to the crime for which the defendant is being tried, there is a danger that jurors will erroneously utilize the impeaching conviction as propensity evidence of guilt and conclude that, since the defendant committed a similar offense, he or she is probably guilty of the offense charged." *Mixon*, 983 S.W.2d at 674 (citations omitted).

A trial court should first determine whether the impeaching conviction is relevant to the issue of credibility. *State v. Waller*, 118 S.W.3d 368, 371 (Tenn. 2003). Tennessee Rule of Evidence 609 suggests that the commission of any felony is "generally probative" of a defendant's credibility. *Id.* The Tennessee Supreme Court, however, has rejected a per se rule that permits impeachment by any and all felony convictions. *Mixon*, 983 S.W.2d 661 at 674. A prior felony conviction must be analyzed to determine whether it is sufficiently probative of credibility to outweigh any unfair prejudicial effect it may have on the substantive issues of the case. *Waller*, 118 S.W.3d at 371. To determine how probative a felony conviction is to the issue of credibility, the trial court must assess whether the felony offense involves dishonesty or a false statement. *Id.*

The State filed a notice of its intent to impeach the Defendant at trial with: an April 2004, Class D felony conviction for theft; a July 2003, Class C felony conviction for theft; an April 2005, Class D felony conviction for facilitation to manufacture methamphetamine; and an April 2005, Class E felony conviction for theft. After hearing the arguments of the parties on this issue, the trial court made the following findings:

> If I understand the position of the parties in this case, the [S]tate contends that [the Defendant] took a vehicle which he knew was to be stolen, or should have known, and made some alterations to it, and [the Defendant]'s response is he had no - - he hasn't testified, but through the statements made by the attorneys, his response is, if it was stolen, I didn't know it; bought it from somebody in good faith. The credibility of [the Defendant] is a very significant issue in this case. The prior theft convictions are certainly relevant to the credibility of the witness, the only problem being these are similar or the same and the impeachment offenses are the same as one of the offenses for which he is now on trial. There is a - - there's certainly a prejudicial effect by allowing this into evidence, but also probative value to it from the standpoint of the [S]tate. In view of the defense that's being raised by the [D]efendant in this case, I think that the probative value outweighs any unfair prejudicial [effect], and if [the Defendant] testifies in the case, I'm going to allow the [S]tate to impeach his testimony through the prior theft convictions.

7

The record demonstrates that the trial court followed the procedural requirements for considering the admissibility of impeachment evidence. The prior convictions for theft were highly probative of credibility because each of the crimes involved dishonesty. The trial court noted that the Defendant's theory of defense appeared to be that he did not know that the car was stolen and that he bought the car in good faith. This theory squarely placed at issue the Defendant's credibility concerning every aspect of how he came to possess the stolen vehicle. As such, the trial court concluded that the probative value of the impeaching convictions outweighed the prejudicial effect in this case.

Accordingly, we conclude that the trial court did not abuse its discretion when it concluded that the Defendant could be questioned about his prior theft convictions if he chose to testify at trial. The Defendant is not entitled to relief as to this issue.

## B. Sufficiency of the Evidence

The Defendant asserts that the evidence is insufficient to support his conviction. The Defendant relies on the State's admission at trial that there was no evidence that the Defendant participated in the initial theft of the car in Kentucky. He also asserts that the State failed to prove that he knew the car was stolen. The State responds that the record supports the jury's conviction of the Defendant. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

8

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

A person commits theft of property if that person: (1) "knowingly obtains or exercises control over the property," (2) "with intent to deprive the owner" of the property, and (3) "without the owner's effective consent." T.C.A. § 39-14-103 (2010). In addition to these three elements, the fact-finder must also determine the classification of the theft, based on the value of the property stolen. Theft of property valued at more than $1,000.00 but less than $10,000 is a Class D felony. T.C.A. § 39-14-105(3) (2010). Theft may also be inferred by the mere possession of recently stolen goods. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995); *State v. Hatchett*, 560 S.W.2d 627, 629 (Tenn. 1987).

The evidence, considered in the light most favorable to the State, shows that, in

October 2011, a 1979 Chevrolet Camaro, valued at $6,100, was stolen from a car dealership in Kentucky. The keys to the car were not taken and broken glass was found on the ground where the car was parked. In May 2012, the Defendant was found driving the same vehicle in Union City, Tennessee. Officer Faulkner, having previous knowledge that the Defendant's driver's license was suspended, stopped the Defendant. The Defendant could not produce a driver's license, proof of ownership of the vehicle, or proof of car insurance. While Officer Faulkner confirmed the Defendant's driver's license, Officer Simmons tried to determine the VIN number from the vehicle to run a vehicle check. When Officer Simmons attempted to scratch the surface of the VIN plate to better view the numbers, the plate came loose and slid down between the dashboard and windshield. Sergeant Wilson testified that typically, GMC attached VIN plates with rivets and not adhesive, as was found attaching the VIN plate to the Camaro. The Defendant, who worked at a car dealership owned by his father, claimed to the officers that he had purchased the vehicle two and a half years earlier. Sergeant Wilson checked on the VIN number from the loose plate and found no file associated with the number. Upon further investigation, Sergeant Wilson confirmed that the Camaro was the same one that had been stolen in October 2011 from Heritage Auto in Kentucky. The Camaro's steering column was broken and the ignition had been removed from the car. Sergeant Wilson testified that a broken steering column and missing ignition are indicative of a stolen car because both must be done in order to start the car without a key.

Based on this evidence we conclude that there was sufficient evidence presented upon which a jury could find, beyond a reasonable doubt, that the Defendant knowingly possessed a stolen car worth more than $1,000, without the owner's consent, and continued to exercise control over the vehicle with the intent to deprive the owner of the same. As we earlier stated, the jury is entitled to weigh the evidence and determine the inferences to be drawn from the evidence. *Rice*, 184 S.W.3d at 662. Based upon the Defendant's experience working in the family business, a used car dealership, his inability to prove ownership, the broken steering column and missing ignition, and the loose VIN plate, the jury could reasonably infer that the Defendant knew the Camaro was a stolen vehicle. Even assuming the jury credited the Defendant's version, as testified to by Ms. Caudle, that Mr. Smith showed up at the Defendant's home late at night seeking to "get rid of" a car for which he had no title, the jury could reasonably infer that the Defendant under those circumstances, knew the car was stolen.

The jury observed and heard the witnesses testify at trial and weighed the evidence the State presented. The jury made reasonable inferences based on this evidence and convicted the Defendant, beyond a reasonable doubt, of theft of property valued between $1,000 and $10,000. We conclude that there was sufficient evidence to support the jury's verdict. The Defendant is not entitled to relief as to this issue.

## C. Jury Deliberations

The Defendant argues that the trial court erred when it instructed the jury to continue deliberating after they notified the trial court, after an hour of deliberations, that the jury was deadlocked. The State responds that trial court properly instructed the jury. We agree with the State.

Under *Kersey v. State*, when the jury advises the trial court that it is deadlocked, the trial court may give supplemental instructions if it "feels that further deliberations might be productive." 525 S.W.2d 139, 141 (Tenn. 1975). In order to avoid intruding on the province of the jury by "coercing the minority to yield to the majority," when instructing the jury to continue deliberations, the trial court should not "direct any of its comments to jurors in the minority" or "urge such jurors to reevaluate or to cede his or her views to those of the majority." *State v. Baxter*, 938 S.W.2d 697, 704 (Tenn. Crim. App. 1996). *Kersey* advises trial courts that they may re-read the portion of the jury charge that explains that the verdict should be unanimous, while warning the jurors against "surrender[ing] [their] honest conviction . . . because of the opinion of [their] fellow jurors." *Kersey*, 525 S.W.2d at 145. However, the trial court is not required to repeat the *Kersey* charge. *See id.* Additionally, when a trial court chooses to repeat instructions or give supplemental instructions, the instructions must be:

> (1) appropriately indicated by questions or statements from jurors, or from the circumstances surrounding the deliberative and decisional process, (2) comprehensively fair to all parties, and (3) not unduly emphatic upon certain portions of the law to the exclusion of other parts equally applicable to the area of jury misunderstanding or confusion.

*Berry v. Conover*, 673 S.W.2d 541, 545 (Tenn. Ct. App. 1984).

In this case, before the jury began deliberations, the trial instructed the jury as follows:

> The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and

11

change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

The jury retired to begin deliberations at 2:54 p.m. and returned to open court at 3:58 p.m, claiming they were unable to reach a verdict. In response, the trial court made the following statement to the jurors:

I got a note from the jury that said that you've been unable to reach a verdict at this point. You've only been deliberating about an hour. That's a very short period of time, and so my response to you, I'm going to send you back out to continue deliberations, and we'll continue on for whatever time it takes to try and reach a verdict. If at some point in time, we can't, we'll declare a mistrial in that event. However, again, it's only been one hour. That's a really short period of time to deliberate a case, and we'll deliberate quite a bit longer. If you have to come back tomorrow, we can do that.

The jury continued its deliberations and later returned a verdict acquitting the Defendant of two of the indicted offenses and finding him guilty of theft of property valued over $1,000.

While the trial court might have repeated the *Kersey* instructions under these circumstances, the trial court was not required to do so. *Kersey*, 525 S.W.2d at 145. The trial court's instruction to the jury to continue deliberations after only an hour was not coercive. *Baxter*, 938 S.W.2d at 70. Furthermore, by not repeating any part of the instructions, the trial court avoided emphasizing portions of the law. *Berry*, 673 S.W.2d at 545. Therefore, we conclude that the trial court's instruction to the jury to continue deliberations was appropriate. The Defendant is not entitled to relief as to this issue.

### D. Jury Instructions

The Defendant contends that the trial court erred when it instructed the jury concerning the fact that an inference could be drawn based on one being in possession of recently stolen property. The Defendant takes issue with the term "recently," arguing that there was a "considerable" amount of time between the car being stolen and when the Defendant was found in possession of the Camaro. He states that the instruction improperly created an inference that the Defendant "had stolen the property." The State responds that the trial court properly followed the pattern jury instruction.

A trial court has the duty, in criminal cases, to fully instruct the jury on the general principles of law relevant to the issues raised by the evidence. *See State v. Burns*, 6 S.W.3d

12

453, 464 (Tenn. 1999); *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *State v. Elder*, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). Nothing short of a "'clear and distinct exposition of the law'" satisfies a defendant's constitutional right to trial by jury. *State v. Phipps*, 883 S.W.2d 138, 150 (Tenn. Crim. App. 1994) (quoting *State v. McAfee*, 737 S.W.2d 304 (Tenn. Crim. App. 1987)). In other words, the trial court must instruct the jury on those principles closely and openly connected with the facts before the court, which are necessary for the jury's understanding of the case. *Elder*, 982 S.W.2d at 876. Because questions regarding the propriety of jury instructions are mixed questions of law and fact, our standard of review here is *de novo*, with no presumption of correctness. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

"A defendant has a constitutional right to a correct and complete charge of the law." *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990), *superceded by statute on other grounds as stated in State v. Reid*, 91 S.W.3d 247 (Tenn. 2002). When reviewing jury instructions on appeal to determine whether they are erroneous, this Court must "review the charge in its entirety and read it as a whole." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Stephenson*, 878 S.W.2d 530, 555 (Tenn. 1994)). The Tennessee Supreme Court, relying on the words of the United States Supreme Court, has noted that:

> [J]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Id*. (quoting *Boyde v. California*, 494 U.S. 370, 380–81 (1990)). A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id*. Even if a trial court errs when instructing the jury, such instructional error may be found harmless. *State v. Williams*, 977 S.W.2d 101, 104 (Tenn. 1998).

In this case, the trial court followed the pattern jury instruction as follows:

> The term "recently" is a relative term and has no fixed meaning. Whether property may be considered as recently stolen depends upon the nature of the property and all the facts and circumstances shown by the evidence in the case. The longer the period of time since the theft, the more doubtful becomes the inference which may be drawn from unexplained possession.
>
> The correctness of the inference and the weight to be given any explanation

that may be shown by the evidence are matters that must be determined by you, and you are not bound to accept either. You must weigh all the evidence presented as to the defendant's alleged possession of the property in question, and decide, in light of all the facts and circumstances present, whether any inference is warranted.

We see no error in the trial court's instruction to the jury. Our Supreme Court has upheld this jury instruction for use in consideration of a theft indictment. *See State v. James*, 315 S.W.3d 440, 450-51(Tenn. 2010). In so doing, the Court reasoned as follows:

The inference of guilty knowledge permitted by the possession of recently stolen property predates our current theft of property statute, Tenn. Code Ann. § 39-14-103 (2006), which was enacted in 1989. *See, e.g., State v. Veach*, 224 Tenn. 412, 456 S.W.2d 650, 651-52 (1970); *Tackett v. State*, 223 Tenn. 176, 443 S.W.2d 450, 451 (1969); *Peek v. State*, 213 Tenn. 323, 375 S.W.2d 863, 865 (1964). Before the 1989 Act, larceny was defined as "the felonious taking and carrying away the personal goods of another." Tenn. Code Ann. § 39-3-1101 (1982). In 1989, larceny and other offenses were consolidated into a single offense, *see* Tenn. Code Ann. § 39-14-101 (2006), and "theft of property" was defined in terms of knowingly obtaining or exercising control over property without the owner's consent and with the intent to deprive the owner of the property. Tenn. Code Ann. § 39-14-103. There is no difference between the actual larceny and either receiving or concealing the stolen property. Thus, the inference of knowledge that the property was stolen from the possession of recently stolen property is particularly suited to our current statute, and, in our view, the instruction by the trial court was proper as to the theft. *Cf. Jones v. Kemp*, 678 F.2d 929, 930-31 (11th Cir. 1982) (affirming jury charge where, under the Georgia theft statute, "proof of unexplained possession of recently stolen property, without proof of scienter, is not sufficient to support a conviction of that crime").

As such, the trial court properly instructed the jury, and the Defendant is not entitled to relief.

### III. Conclusion

Based on the record and aforementioned authorities, we conclude that the evidence is sufficient to sustain the Defendant's conviction. We, therefore, affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE